Please be seated. Your Honors, the formal case of the morning, Call 213-1200, Lana Gross v. Prestige Nursery Garden Center. On behalf of the Appellant, Mr. Kevin J. McNamara. On behalf of the Academy, Maureen Dunst. Mr. McNamara, are you ready? Yes, Your Honor. Good morning, Your Honors. Kevin McNamara on behalf of Appellant Lana Gross. Your Honors, the basis of this appeal is really three main arguments that we've outlined in our brief. The first issue is we're alleging that there's a genuine issue of material fact as to whether the defendant breached its duty to refrain from negligently removing snow and ice from the parking lot where the Appellant plaintiff fell. The second issue is we're alleging that there's a general issue of material fact as to whether the plaintiff fell on a natural or an unnatural accumulation of ice. And the third issue is whether the trial court erred in granting the defendant's renewed motion for summary judgment that had previously been denied by the prior trial judge. Counsel, here, if we look at the contract, the language of the contract, there is no language requiring removal of ice. Isn't that correct? Specifically ice, yes, Judge. All right. And so aren't we bound by the four corners rule? Don't we have to just confine our inquiry here to the language of the contract? Well, I believe, Judge, that the contract does outline the scope of work, and there also is the terms of the contract that indicate that the salting should be done at the discretion of the property manager of the client. In this case- So there's a duty to put down salt and remove snow. Correct. Correct. And there is also language in the contract that says that the contract or this writing is the full and complete agreement of the parties, right? Well, again, Judge, I think that that term, Section C, where they do indicate that the salting is to apply at the discretion of the client property manager, and there was a clear meeting of the minds between the property manager here, Mr. Doug Howey, and Brian Modaff, the two individuals who negotiated the terms of this contract, and they were both under the same agreement that this was a zero-tolerance property. And what they both testified that to mean was that this parking lot was to be completely free of snow and ice. Well, but that language, zero tolerance, does not appear in that contract, does it? It does not, Judge. That was more of an understanding- Right, but we can't consider that. How can we consider that, Counsel? Well, Judge, I think that this contract is not-like some of the other cases that defense counsel cited where the contract is clear and unambiguous, I'd make the argument that this contract is not clear and unambiguous as to- You're saying it's ambiguous? Well, I think that there is some discretion there in how to apply-how to address this ice removal, and I think that's the term I'm referring to, is this whole issue of- But what do you mean how to address ice removal? How can we focus on ice removal when there's nothing in the contract regarding ice removal? Well, I believe that the meeting of the minds between the parties is that this parking lot was to be absolutely free of snow and ice at all times. Was that the testimony? I believe it was. Where's the testimony from the Prestige employees that they voluntarily agreed to remove all the ice? Well, the testimony of Brian Modaff, who is the manager of Prestige, indicated that it was his understanding that this was a zero-tolerance property, and I can refer you to C-261 in the record. That's a reference to Mr. Howey's testimony regarding zero-tolerance. Mr. Modaff testified as follows, and this is C-264 in the record. No matter what, the place is clear. The place is salted.  Doug Howey, the facilities manager at System Sensors, was very-this was our high-priority place, System Sensors was, so it was always done first, and it was maintained continually through a storm. In accordance with the contract, though. That's what he's talking about. That testimony is in reference to the contract. Well, if I can go on, on C-266 of the record, he was asked what his understanding of zero-tolerance meant, and he said System Sensors was zero-tolerance. You know, when they came in to work that lot, I wanted it-you could see every parking spot. I mean, you could see everything was black pavement, so you know, we hit them a little bit extra, with a little bit extra salt. But his understanding of zero-tolerance is irrelevant, isn't it? Because that term does not appear in the contract. It's not in the written contract. But we can't-there's no oral contract between these people. Well, Judge, I would- There's no parole evidence that we're permitted to use, is there? Or to look at? Again, Judge, I would refer to that term of the contract, that they agreed that this problem would be addressed at the discretion of the client property manager, who is Mr. Doug Howley, who negotiated this contract with Mr. Modath. That would be, I believe, the agreement that they reached regarding ICE, this black pavement argument. But they clearly did not put anything in the contract as an addendum that specifically said, this is the understanding of the then-client property manager and the-whoever was in charge from Prestige. Is that correct? There's no written addendum, no, Your Honor. And putting down ICE and wanting to see the black pavement- Putting down salt. Putting down ICE. I was going to say black ice. Putting down the salt so that you could see the black pavement is the-how they performed. But, again, that's not-that's how they wanted to perform. But that is not specifically identified as the way that they were going to salt the place in the contract. Well, I believe the clear understanding of the parties is that there would be no ice formation. They agreed to salt and plow continuously throughout the storm, a storm. And I believe that's how they addressed the issue of salt formation, or ice formation, is they wouldn't allow ice to even form because this was agreed upon between the parties, black pavement at all times, zero tolerance. And that's the term- And the reason I was having trouble with ice and salt is black ice is clearly a very dangerous situation that could not necessarily be seen on any pavement. Absolutely, Judge. But I think that's not what we have here. We have a mound, a two-feet of mound of formation of ice approximately two inches high. I mean, this isn't a situation where it's something that would not be apparent and that, you know, was something that's essentially hidden from view. Had they complied with the terms of their written agreement and been out there continuously throughout the storm, there would have never been this formation of snow-of this ice and snow. Well, do we have a question about that? Were they-I mean, some of the people were in the building and really didn't know. They didn't even know necessarily that it was snowing at the rate it was snowing and that it had turned to an icy mix. What is-you know, how do we know that they were there at all that day? Well, initially there was a question. I mean, they have offered testimony, and that was one of the issues I raised with Judge Seider's ruling. I believe that he misunderstood the facts that were before him because he indicated his ruling was based upon the fact that they were not there that day. And clearly there is evidence from Mr. Vandersteif, who was primarily responsible for this lot, that he was there. He testified in his deposition that he was there continuously throughout the storm that day. Yet we have evidence from the DuPage Airport where they measured the snow and ice. It had not-it stopped snowing that morning at 852. Plaintiff's fall occurred just after midnight. So there's this 15-hour gap where there is no precipitation, yet there is this formation of a 2-foot by 4-inch mound of ice, and it contradicts his testimony that he had been there, you know, throughout the day. Where is the link between the unnatural accumulation of snow and the ice patch? Where's the link? Where's the link between that-their contractual duty and that patch of ice? Well, they offered testimony that they had provided 7 tons of salt that day, and Mr. Modaff gave an evidence deposition in this case. He's the manager for system sensors, and he basically states, and I've cited it in my briefs, that if the salt was applied properly, it's-they use only the most effective ice, and it would not-he would not anticipate ice to form, certainly not to the extent it did if it was applied properly. And that's the link. If they did, in fact, as they say, distribute 7 tons of salt, there would have never been an ice formation that day. So the evidence of an unnatural accumulation is the amount of salt that was applied or not applied? No, I believe- Is that what you're saying the evidence was? In other words, the link or the evidence here, because I was going to ask a similar question. What is the evidence here of how the ice formed so as to become an unnatural accumulation and- There is the testimony of Jim Wolferson, who was the eyewitness to the fall, who's also the supervisor at system sensors. He testified that basically they-when they had plowed, they utilized this front edge plow, and he said it caused mounds to form that day. And there were-there was evidence of these snow piles and ice formations where Plato fell, and if you look at the written terms of the contract, the system sensors was required under Section E of the contract called scope of work. They were to remove all ruts and drifts left by any snow plows. That's explicit in the contract. Ruts and drifts in the pathway between the cars, correct? I believe they referenced driveways and- Right. Yeah. Yeah, they're not talking about the snow that gets pushed up, I think the testimony was, to the back of the vehicles and to the front of the vehicles, correct? I believe so. Yeah. And the trial judge's ruling was the court said there's no evidence or even suggestion that the plaintiff fell on anything other than a natural accumulation of ice. Right. And I believe, Judge, that's what I'm referencing. I believe the area where she fell was an unnatural accumulation. I believe that these mounds that had formed were due to the snow plow. But they can only be liable if they're aggravated unnatural accumulation, correct? Well, an aggravated unnatural or, I mean, if they aggravate the condition that's there, I believe they are liable, Your Honor. I mean, this plowing, I mean, I believe that they created this dangerous condition due to their plowing. Either create or aggravate an unnatural accumulation of ice. But how do we know that this, you're saying that because it was caused, somehow we know this was caused by the plow and, therefore, it's an unnatural accumulation. Is that right? Yes, Judge. Well, what if it was an unnatural accumulation of snow but a natural accumulation of ice because snow melts? Correct. And to me, when I read the judge's statement in his ruling, that's what he was saying. Unnatural accumulation. Snow melted and it became ice. Well, I don't believe the snow was ever melted, Judge. I don't think it was properly removed to begin with, and I think that's what had formed the ice. I mean, there's clearly an accumulation of snow here of more than four inches, and they did… Your theory is that the plow somehow came up and must have come back down. How did the mound end up there? No, Judge, I believe they were there. I believe they did plow at some point. I believe they created these mounds, and then I believe there was an extended period of time where they didn't return, and the snow and the ice continued to accumulate through this 15-hour period of time. I believe that's what occurred. But yet, you're also saying that there was no snow after 8.52 a.m. Correct. So where is it coming from? Well, I believe that they did. I don't think anyone disputes it was a significant snowstorm on December 1st throughout the night leading into the early morning hours of December 2nd. I believe that they came, and their testimony was that this was the first place they hit every day. He couldn't give me an exact time, but I believe he was probably there at 4, 5, 6 in the morning and then never returned. He probably did apply the seven tons of ice. He plowed, he created these ruts and drifts that surrounded the cars, and then he never returned. And it stopped snowing, and he probably went on to do his other jobs that he hadn't addressed at that point. Again, system sensors was the first job of the day. And I believe that's what caused the ice to form. Again, just go back to the understanding between the parties that this, I mean, we're talking about black pavement where you can see every spot. And again, there was repeated requests throughout the day that they come back and perform according to their duties. They agreed upon zero tolerance policy, and they ignored these requests. All right. Well, who, I mean, I must admit to that one. Who requested that they come back? Was there a specific phone call to somebody that was testified to? There were multiple phone calls, and there's e-mails evidencing the phone calls. A gentleman named Sam Signorelli did indicate that he called Brian Modaff, the system sensors manager, multiple times throughout the day requesting him to return. To do what if there's no snow falling? To finish the job. Well, there are cars. This business is apparently a 24-hour-a-day business, and so they're going to have cars. There's nothing in the agreement that I could find that said they had to remove all the cars in case of snow. So that being the case, how are they going to remove all of the snow? Well, I mean, there is specific indications in the contract that when they are done plowing, they're supposed to remove any ruts with blowers and things like that. And there's no evidence that they did that. You know, it's our contention that they did create these mounds and that they left them and never returned and they were never addressed. Well, if your client had fallen on snow, that might be a pretty solid argument, but we all agree, don't we, that it was ice as opposed to snow that was the probable cause of this fall? Yes, Judge. Okay. Any other questions? Justice. All right, you'll have an opportunity for a reply. Thank you, Your Honor. Thank you. Ms. Dunsing. Good morning, Your Honors. Good morning. May it please the Court and Counsel, my name is Maureen Dunsing, and I'm here on behalf of the defendant appellee, Prestige Nursery Garden Center, and today I'm respectfully asking the Court to affirm the trial court's finding of summary judgment in favor of my clients. With regards to plaintiff's argument regarding the zero tolerance duty, as Justice Zinoff has previously indicated, that was nowhere in the contract language. The contract is clear and unambiguous. They were to remove snow and to apply salt under the terms of the contract. But, I mean, what was the purpose of applying salt, Counsel? Obviously to avoid any accumulation of ice, right? Of course. Of course. That's the purpose of putting salt down. Salt also melts snow as it falls. Correct. So it's both. Correct. So isn't the understanding of the parties then important on what that meant, even though the words weren't in there? It's in the words zero tolerance weren't in there. I believe it's important to apply salt in order to try and prevent these types of things. However, I don't believe that a duty to apply salt can necessarily equate into a duty to remove every piece of ice that accumulates despite salt being put down. Zero tolerance was really a term of art that was coined by the people at my facility or my client's facility, basically to say that this was a priority for them, that they were supposed to be there as frequently as could reasonably be done, get as much out as possible. They wanted it to be as safe as possible. However, to infer that that somehow creates an ongoing duty for a snow removal contractor to keep an entire parking lot completely free from snow and ice would be impossible. Even in the Eichler case, in reversing summary judgment for two defendants, the court found that a duty to remove all snow must be reasonably construed so as not to lead to absurd results. So to try and extend this zero tolerance term of art is to somehow put a duty on a snow removal contractor to keep this facility, it's an enormous facility, completely clear at all times. It would be impossible. That would mean virtually if it snowed throughout the day that they wouldn't be able to serve any other clients. Exactly. And they still probably wouldn't be able to do it just due to the size of the facility. Just one end of the facility would pile up while they're continually shoveling the same place. It would lead to absurd results. Did it actually snow that day? The testimony from the witnesses was that it was snowing continuously throughout the day. The weather report is somewhat in contradiction with the testimony of all the witnesses. Obviously, it did snow quite a bit at some point. When that stopped, I personally don't know. So at the airport in DuPage, it said it stopped and they said, what, two inches or something had fallen? But yet everybody who testified said that there was in excess of two inches, correct? Correct. Everyone who testified stated this was a heavy blizzard-like storm that just was continually sleeting and icing throughout the day. And your client's obligation under the contract was after two inches had fallen, they needed to get out there and do whatever the contract required. Correct. To remove snow and apply salt. Do we have any information in this record? I mean, seven tons of salt is a lot of salt. I agree. I mean, I think some villages don't use that much. So do we have a log of when they were there or testimony of the times of the day they were there? Unfortunately not. My reflection is that they do not keep logs of when their trucks go out to each individual property. So really the only thing we had was the salting invoice, which was actually provided by Jory Ray, who was an employee at System Sensor. That was their invoice that they received later. Furthermore and more importantly, I think with regards to the duty, the plaintiff is a third-party beneficiary to this contract. My client's duty to her was simply that of reasonable care. They needed to perform snow removal and apply salt in a non-negligent manner. And in order to do that, as Your Honors have pointed out already, basically that puts the burden on the plaintiff to show that my client somehow created or aggravated this unnatural accumulation of ice, which there's no evidence of. This is a dome of ice in the middle of a parking aisle. The testimony of Jim Malthuson with regards to the mounding of snow, I believe as Justice Burkett pointed out, that was at the backs and fronts of vehicles. They had gone down the aisles, and obviously when you're pushing snow on the sides of the plow, snow piles up. This ice is in the middle of the driving aisle. There's no testimony or evidence whatsoever that links the mounding of snow from the snow plow to this ice in the middle of the aisle. In fact, counsel admits that this was likely a natural accumulation of ice. And there's simply no duty for my client to go out there and chip away natural accumulations of ice under this contract. How does a natural accumulation of ice occur in the middle of a roadway? I have no idea. How about somebody pulling out and hitting the brakes, not having defrosted or cleaned their windshield or the back of their hood, and the ice and snow slides off of their vehicle into the middle of the drive. Would that be a natural or unnatural accumulation of snow or ice? I believe under the case law that would still be a natural accumulation of ice because— Because it's something you don't have control over as a person doing the plowing. Right. And I apologize. I don't have the case right in front of me. But there is a case that discusses pedestrian traffic and ice that's formed by cars driving over things. But that's still not considered a natural accumulation. Which is anticipated here because they know that there are going to be cars parked and snow is going to get pushed back out. Snow is going to slide off the vehicle. And for that reason, the contract calls for putting salt down at the discretion of the manager. Correct. Again, I don't think there's any evidence or testimony whatsoever that would support a link to any of the actions of the defendants and this patch of ice upon which the plaintiff fell. With regards to whether Judge Souter had authority to rule in the motion, I believe it's clear in the case law that the court has inherent authority to reconsider and correct its rulings, which I believe Judge Souter did in this case. But there were two different judges here. I mean, this wasn't just one judge changing his mind. Correct. This case was reassigned, I think, four times. It actually was before quite a number of judges in the DuPage courthouse. And yes, Judge Ellison did originally grant summary judgment. He then granted a motion to reconsider that finding. And we renewed our motion for summary judgment before Judge Souter quite a bit later. Does that make a difference? I don't believe so. I think the case law cited in my brief is pretty clear the same exact situation occurred and this court previously found that that's not an issue, essentially. And neither case I would review is de novo. Correct. And this is Judge Souter's ruling that we're dealing with today? That is correct. All right. But there is some implication that because Judge Ellison had ruled another way, that that would somehow indicate that two reasonable people had different ideas about whether there were facts and therefore we should accept that there were material disputed facts. Again, I think that was addressed, and I believe it's Stephen's case, that essentially just because two judges come to different conclusions, that does not necessarily create an issue of fact. Is it clear from the record whether or not Judge Ellison reconsidered based upon a misapplication of the law, or he wasn't mistaken about the facts? Judge Ellison issued a written decision which was very short and merely cited the Williams case. And I believe that the order indicated that there was a question as to whether the defendant had breached their contractual duty, and that was the reasoning behind his reversal of his prior finding. With regards to whether or not the defendants were actually present on the day in question, in his ruling Judge Souter does mention that there's no evidence that the defendants were there. I believe he was considering the facts in the light most favorable to the plaintiffs in making that finding. That was the plaintiff's argument all along since the get-go, that our clients never showed up, they were never there. So I do believe that was Judge Souter viewing the facts in the light most favorable to plaintiff. Regardless whether my client was there as he stated he was there, there's still no evidence whatsoever that we somehow created or aggravated this patch of ice. So, again, I believe that summary judgment was completely appropriate. And, again, I would ask that this court affirm. If there's no other questions, then I'll rely on my brief. Thank you very much. Thank you. Mr. McNamara. Thank you. Just very briefly, Your Honor. Again, I'd just like to address the issue of the meeting of the minds between the parties regarding ICE. I'd just refer you to C-261 in the record. It's Doug Howey, again, the person who negotiated the contract on behalf of System Sensors. He testified as follows regarding the zero tolerance. And he indicates that he told them that ICE is not acceptable. I have to have it cleared around the clock. And Mr. Modaff and Mr. Vandersteif both testified that their understanding of the contract was that it would be removed continuously throughout the storm. I think the multiple e-mails and multiple telephone calls from Sam Signorelli indicate that they did not remove snow or ice continuously throughout this storm. Let's take Justice Burkett's example. And sometime after – and for purposes of this scenario, too, we will assume that they were there at some point during the day. Okay. That they came, they cleaned up what they could, they left, and somebody backed their car out, didn't clean the back windshield or depending on which way the car was going, didn't clean snowdrop there. How was Prestige to know that at that particular moment, snow dropped there? I would agree that there would be no way of knowing that, Your Honor. But I think that clearly that wasn't the case here. This lot was a complete disaster by all accounts. There were six other falls that day. And there's requests throughout the day. I don't think this is a situation where it was an isolated incident where, you know, perhaps this was one small area of snow or ice on a flat pavement lot. We don't have that scenario here. And Mr. Wolterson, the eyewitness, testified that this mound where she fell was where the area where the plows had pushed the snow. I think certainly there's at least a question of fact as to how that formation occurred. Well, when you say where they had pushed the snow, I mean, they were going – it was in the middle, and they were going down. And, I mean, most snow plows, some is going to come off the end, and I assume that's what's under the back end and the front end. And the rest of it is going to stay with them until they get to some natural or unnatural barrier like a wall at the end of the drive. So where is this with reference to these snow mounds under the cars? Is it right – is it next to one or the other, or is it more toward the middle? I believe it was more towards the cars, as Mr. Wolterson's testimony. I believe he said the cars – this plow pushed it away from the center aisles towards the cars. And that's the area where Mrs. Gross fell. I'm still having trouble getting past or thinking about the language of this contract being ambiguous and therefore looking to testimony as to zero tolerance and intent. Where are the obligations ambiguous when it talks about removal of snow and application of ice? I'm not using the exact terms, obviously, but maybe you can address that one more time for me. Absolutely, Judge. In the plain language of the written contract, Section C – and it's C-34 in the record – Section C indicates salting will be done at the discretion of the client's property manager unless otherwise agreed upon in writing and attached to this contract. Okay. That's where I would argue – I'm sorry. Go ahead. That's where I would argue that you have to look at the intent of the client's property manager when he wants the salting to be done. Well, let's assume he wanted the salting to be done every hour. Correct. Okay. But then doesn't he – should he come – was the salting done every hour as opposed to focusing on the result of not salting, which is the accumulation of ice? I mean, I guess I don't get the link or the jump. I mean, how do we get past the language here? Even if it says salting done at discretion and they said we want the salting done every hour? I think they all agreed that it was continuously throughout the storm. Mr. Modath and Mr. Vandersteif both agreed that was their understanding of the contract. And that was Mr. Howell's testimony, you know, where he specifically references the term ice in his negotiations with Doug Howell. And he said – and, again, this is his – the discretion of the property manager, and it's 261 on the record. His – Doug Howell, the facility's manager, testified regarding zero tolerance. I told them that, you know, ice is not acceptable. I have to have it cleared around the clock. So you are referring to the words at the discretion. In other words, the meaning of the words at the discretion. It's his discretion under the written term of the contract. It's his discretion as to how to address the salting. And when we look at the evidence, he clearly testified ice is not acceptable. And he told that to Doug Howell. But you're saying at the discretion is ambiguous so that we can then look to the testimony. Correct, Judge. Okay. Thank you. And he specifically told Mr. Howell that I have to have it cleared around the clock. Thank you both for your arguments here today. We appreciate the completeness of them. There is one thing. We invite you to come back for oral arguments. But if you are going to have a contracted issue, well, we have access to the entire record, obviously. And sometimes we have e-records from DuPage County. This is not one of them. If there's a contract you want us to look at, it should be with your brief and your appendix of your brief. So just keep that in mind for the next time around because we do invite you back whenever you need to come. Thank you, Your Honor. Thank you.